**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 23, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

|  |  |
|---|---|
| HUGO ROSARIO GUTIERREZ-BRIZUELA, | |
| Petitioner, | |
| v. | No. 14-9585 |
| LORETTA E. LYNCH[*], United States Attorney General, | |
| Respondent. | |

---

**Petition for Review of an Order of the
Board of Immigration Appeals**

---

Timothy Lee Cook, Law Office of Timothy L. Cook, Oklahoma City, Oklahoma, for Petitioner.

Monica Antoun, Trial Attorney, Office of Immigration Litigation (Benjamin C. Mizer, Principal Deputy, Assistant Attorney General, and Joyce R. Branda, Acting Assistant Attorney General, Civil Division, and Jennifer P. Levings, Senior Litigation Counsel, and Shelley R. Goad, Assistant Director, Office of Immigration Litigation, with her on the briefs) of the United States Department of Justice, Washington, D.C., for Respondent.

---

Before **GORSUCH**, **McKAY**, and **BACHARACH**, Circuit Judges.

---

[*] Loretta E. Lynch has been substituted for Eric H. Holder, Jr., pursuant to Federal Rule of Appellate Procedure 43(c)(2).

---

**GORSUCH**, Circuit Judge.

---

We recently confronted the thorny problem what to do when an *executive* agency, exercising delegated *legislative* authority, seeks to overrule a *judicial* precedent interpreting a congressional statute. In our constitutional history, after all, judicial declarations of what the law *is* haven't often been thought subject to revision by the executive, let alone by an executive endowed with delegated legislative authority. Still, in recent years the Supreme Court has instructed us that, when a statute is ambiguous and an executive agency's interpretation is reasonable, the agency may indeed exercise delegated legislative authority to overrule a judicial precedent in favor of the agency's preferred interpretation. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.* (*Brand X*), 545 U.S. 967 (2005). And that development required us to confront this question: accepting that an agency may overrule a court, may it do so not only prospectively but also retroactively, applying its new rule to completed conduct that transpired at a time when the contrary judicial precedent appeared to control? *De Niz Robles v. Lynch*, 803 F.3d 1165 (10th Cir. 2015). Now that curious question has returned, this time with a twist.

- 2 -

Our story starts with two provisions buried in our immigration laws: 8 U.S.C. §§ 1255(i)(2)(A) and 1182(a)(9)(C)(i)(I). The first statute "grants the Attorney General discretion to 'adjust the status' of those who have entered the country illegally and afford them lawful residency." *De Niz Robles*, 803 F.3d at 1167. The second "provides that certain persons who have entered this country illegally more than once are categorically prohibited from winning lawful residency . . . unless they first serve a ten-year waiting period outside our borders." *Id.* Observers have long noted the tension between the two laws and wondered which should control. Employing the usual tools of statutory interpretation, this court in 2005 determined that the Attorney General's discretion to afford relief without insisting on a decade-long waiting period remained intact. *Padilla-Caldera v. Gonzales* (*Padilla-Caldera I*), 426 F.3d 1294, 1299-1301 (10th Cir. 2005), *amended and superseded on reh'g by* 453 F.3d 1237, 1242-44 (10th Cir. 2006).

That judicial declaration of what the law is turned out to be anything but the last word. Not because the Supreme Court disagreed. But because in 2007 the Board of Immigration Appeals (BIA) issued *In re Briones*, 24 I. & N. Dec. 355 (BIA 2007). There the BIA offered its view that — as a matter of policy discretion — the statutory tension should be resolved against affording the Attorney General any discretion to consider applications for adjustment of status when § 1182(a)(9)(c)(i)(I) applies. A conclusion directly at odds with the one we

- 3 -

reached in *Padilla-Caldera I*. When the agency later sought to apply its new rule announced in *Briones* to a petitioner in this court, we agreed that the two statutory directives were ambiguous; that "step two" of *Chevron* required this court to assume that Congress had delegated legislative authority to the BIA to make a "reasonable" policy choice in the face of this statutory ambiguity; and that the Supreme Court's extension of *Chevron* in *Brand X* further required this court to defer to the agency's policy choice and overrule our own governing statutory interpretation in *Padilla-Caldera I*. *See Padilla-Caldera v. Holder* (*Padilla-Caldera II*), 637 F.3d 1140, 1148-52 (10th Cir. 2011).

But even that was hardly the end of it. Everyone accepts that, after *Padilla-Caldera II*, all future petitioners must satisfy the ten-year waiting period and may not seek discretionary relief from the Attorney General. But what about petitioners who applied for discretionary relief in express reliance on *Padilla-Caldera I*, before the BIA's announcement of its contrary interpretation in *Briones*? In *De Niz Robles*, the BIA sought to apply *Briones* retroactively to foreclose any chance of discretionary relief for this class of persons. This court disallowed the attempt, holding that because the agency's promulgation of a new rule of general applicability under *Chevron* step two and *Brand X* is an exercise of delegated legislative policymaking authority, it is subject to the presumption of prospectivity that attends true exercises of legislative authority. 803 F.3d at 1172-74.

- 4 -

The BIA isn't one to give up, though.  Today it brings us a new case that involves a (slight) variation.  Like Mr. De Niz Robles, Hugo Gutierrez-Brizuela applied for adjustment of status in reliance on our decision in *Padilla-Caldera I* during the period it remained on the books.  About that much there is no dispute.  But unlike Mr. De Niz Robles, Mr. Gutierrez-Brizuela applied for relief during the period *after* the BIA's announcement of its contrary interpretation in *Briones* yet *before Padilla-Caldera II* declared *Briones* controlling and *Padilla-Caldera I* effectively overruled.  The BIA suggests this factual distinction makes all the legal difference.  But we fail to see how.  Indeed, the government's position in this appeal seems to us clearly inconsistent with both the rule and reasoning of *De Niz Robles*.

Take the rule first.  *De Niz Robles* held that *Briones* was not legally effective in the Tenth Circuit until this court discharged its obligation under *Chevron* step two and *Brand X* to determine that the statutory provisions at issue were indeed ambiguous, that the BIA's interpretation of them was indeed reasonable, and that *Padilla-Caldera I* was indeed overruled.  As we explained, "[a]n agency in the *Chevron* step two/*Brand X* scenario may enforce its new policy judgment only with judicial approval.  So, for example, the BIA depended on *Padilla-Caldera II* to render *Briones* effective."  *Id.* at 1174 n.7.  Until this court handed down *Padilla-Caldera II*, then, *Padilla-Caldera I* remained on the books as binding precedent in the Tenth Circuit on which litigants were free (and

expected) to rely, and *Briones* bore no legal force. Yet, despite *De Niz Robles*'s clear holding on this very score, the BIA today seeks to apply *Briones* to conduct in this circuit that predates *Padilla-Caldera II* — when *Padilla-Caldera I* was the controlling law of this circuit and *Briones* was not. That *De Niz Robles* expressly forbids. *Cf. Bankers Trust N.Y. Corp. v. United States*, 225 F.3d 1368, 1376 (Fed. Cir. 2000) (noting that where "the original decision was based on direct judicial construction of [a] statute, not deference" to the agency, it remains "the law of this circuit" until it is "overturned" or a "later amendment to the statute is effective").

Next consider the reasoning. In *De Niz Robles* we explained that, to the extent the executive is permitted to exercise delegated legislative authority to overrule judicial decisions, logic suggests it should be bound by the same presumption of prospectivity that attends true legislative enactments. 803 F.3d at 1172. After all, agents usually depend upon (and are limited to) the powers enjoyed by their principals. *See generally* Restatement (Second) of Agency § 17 (1958). And we know that, if Congress had sought to amend the law to unseat a judicial decision like *Padilla-Caldera I*, absent some clear direction otherwise (and subject to constitutional limitations on retroactive legislation), its actions would have controlled conduct arising only *after* the legislation went into effect. *See Landgraf v. USI Film Prod.*, 511 U.S. 244, 270-73 (1994). And here *Briones* went into effect in this circuit only when this court handed down *Padilla-Caldera*

*II*.  Meaning that individuals like *both* Mr. De Niz Robles *and* Mr. Gutierrez-Brizuela would have been free to rely on *Padilla-Caldera I*.  Neither, as we explained in *De Niz Robles*, can we think of a sound reason why persons should be left in worse shape simply because they are the subjects of delegated legislative action rather than subjects of true legislative action.  Indeed, as we noted in *De Niz Robles*, the Supreme Court itself has expressly recognized that "[c]ongressional enactments . . . will not be construed to have retroactive effect unless their language requires this result.  By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."  803 F.3d at 1172 (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (internal quotation marks omitted)).  And, of course, no one before us contends that Congress has expressly conveyed to the BIA the power to declare its rules retroactive.[1]

---

[1]  At this point you might interject to question our analogy to legislative action.  After all, an agency may enforce its new policy judgment under *Chevron* step two and *Brand X* only with *judicial* approval.  And, quite unlike legislative action, which is subject to a presumption of prospectivity, judicial action is of course subject to a presumption of retroactivity.  *See De Niz Robles*, 803 F.3d at 1170.  But *De Niz Robles* already rejected an argument along these lines, *see id.* at 1174 n.7, and the BIA does not pursue any such argument in this case — and for good reason.  The fact is, the agency rule a court ratifies in the *Chevron* step two/*Brand X* scenario clearly proceeds from the agency exercising delegated legislative authority, not the court.  Consider first the fact that when announcing its rule an agency is neither seeking the "best" reading of the statutory text nor adopting a "once-and-for-always definition of what the statute means," *Garfias-*

- 7 -

The due process and equal protection concerns that animated our holding in *De Niz Robles* also apply to this case.  In *De Niz Robles* we explained that legislation is presumptively prospective in its operation because the retroactive application of new penalties to past conduct that affected persons cannot now change denies them fair notice of the law and risks endowing a decisionmaker expressly influenced by majoritarian politics with the power to single out disfavored individuals for mistreatment.  *See* 803 F.3d at 1169-70.  These very same concerns would arise if the BIA could apply *Briones* retroactively to Mr. Gutierrez-Brizuela's conduct.  After all, back in 2009 the law expressly gave Mr. Gutierrez-Brizuela two options:  he could seek an adjustment of status pursuant to *Padilla-Caldera I* or accept a ten-year waiting period outside the country.

---

*Rodriguez v. Holder*, 702 F.3d 504, 515-16 (9th Cir. 2012) (en banc), but seeking instead to exploit a gap in the statute to implement its own (continuously revisable) policy-influenced vision of what the law should be, *De Niz Robles*, 803 F.3d at 1176.  Then consider the highly unusual nature of the court's task under *Chevron* step two and *Brand X*:  the court doesn't ask whether the agency's interpretation of the law is superior (or its prior interpretation wrong in some way), only whether the agency's interpretation falls within the scope of the permissible.  The court doesn't attempt to say what the law *is* (our normal function) but only whether the agency's attempt is a *reasonable* one.  And finally consider that, when overruling our own governing precedent, a court may not consult or speak a word about the principles of *stare decisis* that normally attend to (and do much to discourage) the overruling of judicial precedent.  Instead, the court disregards all that and favors the agency ruling over its own precedent simply because the agency has offered a permissible interpretation.  *See Padilla-Caldera II*, 637 F.3d at 1147.  Under these circumstances, it seems to us "there can be little doubt that," while a court must approve the agency's new rule, the rule "emanates in substance" not from the court but from the agency exercising delegated legislative authority.  *De Niz Robles*, 803 F.3d at 1174 n.7.

Relying on binding circuit precedent, he chose the former path. Yet the BIA now seeks to apply a new law to block that path at a time when it's too late for Mr. Gutierrez-Brizuela to alter his conduct. Meaning that, if we allowed the BIA to apply *Briones* here, Mr. Gutierrez-Brizuela would lose the seven years he could've spent complying with the BIA's ten year waiting period and instead have to start that waiting period now. The due process concerns are obvious: when Mr. Gutierrez-Brizuela made his choice, he had no notice of the law the BIA now seeks to apply. And the equal protection problems are obvious too: if the agency were free to change the law retroactively based on shifting political winds, it could use that power to punish politically disfavored groups or individuals for conduct they can no longer alter. *See id.* at 1168-69, 1174-75.

Beyond looking directly to the due process and equal protection considerations that underlie the presumption of legislative prospectivity, in *De Niz Robles* we also consulted both the doctrinal rubric the Supreme Court suggested in *SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194 (1947), for deciding when to give retroactive effect to agency action, and our own similar formulation in *Stewart Capital Corp. v. Andrus*, 701 F.2d 846 (10th Cir. 1983). We found these authorities and their factors also counseled against allowing the BIA to apply its decision to individuals like Mr. De Niz Robles. *De Niz Robles*, 803 F.3d at 1175-80. And we find they do the same thing today. Neither should any of this come as a surprise, for the factors discussed in *Chenery II* and *Stewart*

*Capital* simply seek to provide a doctrinal rubric for assessing the underlying due process and equal protection implications associated with retroactive agency action. And whether we analyze those concerns directly (as we just have) or indirectly (using these doctrinal rubrics), the answer should of course be the same. *Id.* at 1180.

To decide whether to permit retroactive agency action, both *Chenery II* and *Stewart Capital* essentially counsel us to "weigh" the costs the petitioner would encounter against the benefits the agency would enjoy. *See id.* at 1177. And in this case, as in *De Niz Robles*, it seems to us that balance tips decidedly in one direction. Consider the costs we would impose on petitioners. Normally, people are entitled to rely on judicial precedents as definitive interpretations of what the law is so long as those precedents remain on the books. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994); *AT&T Corp. v. Hulteen*, 556 U.S. 701, 711-13 (2009). To allow the BIA to apply *Briones* here, to actions during a period when *Padilla-Caldera I* was on the books and *Briones* was not the law of this circuit, would upset this principle and invite individuals to disregard on-point judicial precedent (maybe even Supreme Court precedent) because of its potential susceptibility to revision by an executive agency. *See De Niz Robles*, 803 F.3d at 1178-79. It would also require the people to substitute reliance on judicial declarations of what the law is with finely grained legal judgments about the degree of ambiguity in the relevant statutory provisions and the

- 10 -

reasonableness of agency pronouncements about them. Questions that frequently provoke deep disagreement even among our most eminent jurists, let alone lay persons. *See, e.g.*, *Michigan v. EPA*, 135 S. Ct. 2699 (2015). Indeed, at the time of Mr. Gutierrez-Brizuela's application, just as at the time of Mr. De Niz Robles's, it was far from clear that this court would ever permit enforcement of *Briones*. Back then it remained a distinct possibility that this court might find either the statute unambiguously opposed to the agency's position or the agency's interpretation an unreasonable one. *See De Niz Robles*, 803 F.3d at 1179 & n.10. Are we really to expect that persons in such circumstances should have to bear the cost of ignoring directly controlling judicial precedent in favor of the speculative possibility that an executive revision might ultimately prevail? Add to that the costs associated with imposing this kind of uncertainty on an entire class of persons with significant interests at stake (the potential right to remain lawfully in this country), and the BIA's failure to identify any benefits of any kind that might be vindicated through retroactive application of its new rule, *see id.* at 1179-80, and we just do not see how the agency might prevail.

Confirming our assessment on this score is the fact that the BIA itself was once — and not long ago — sensitive to the due process and equal protection concerns associated with retroactive application of its new rules. It followed a practice of deferring to adverse circuit precedent so long as that precedent remained on the books, even when the agency may have disagreed with it. *See,*

*e.g.*, *In re Anselmo*, 20 I. & N. Dec. 25, 31 (BIA 1989) (collecting cases). In fact, in *Briones* itself the BIA expressly refrained from deciding the applicability of its new rule to cases arising in this circuit, given that we had previously adopted a contrary view of the relevant statutes' meaning. *See Briones*, 24 I. & N. Dec. at 370-71 & n.9. So it is that even the agency itself once suggested that *Padilla-Caldera I* would and should continue to control in this circuit until overruled by judicial authority. Given that, we are left at a loss to see how it would be consistent with due process (fair notice) principles to permit the agency now to take the opposite view. Effectively pulling out from petitioners like Mr. Gutierrez-Brizuela a rug that the agency itself set under them.

To be sure, the BIA says that was then and this is now. Now the agency replies that *Briones* must apply to all cases, even cases arising before its judicial adoption in circuits with contrary precedent. It must, the agency says, because "[f]or *Brand X* to have any practical application, the Board must be able to apply *Chevron* step two, policy-type decisions immediately, regardless of the existence of a prior, contrary judicial interpretation. Otherwise, the Board would never be able to disagree with a prior, competing judicial decision" as *Brand X* says it may.

We just don't see it. To be sure, our holding about the inefficacy of *Briones* to decisions predating its approval by this court in *Padilla-Caldera II* raises the interesting question how an agency might go about exercising its *Brand X* powers to overrule prior judicial decisions. If the agency tries to apply a new

- 12 -

rule to a pending case in a circuit where there is adverse judicial precedent, and if

the court replies that the judicial precedent controls until reversed, how is the

agency ever to get its new authority to take effect?  The question may represent

yet another conundrum invited by *Chevron* step two and *Brand X*.  But we have

no difficulty imagining a way out of this particular one that also allows us to

avoid due process and equal protection problems.  Agencies could seek to enforce

their new interpretations and courts could then fulfill their *Chevron* step two and

*Brand X* obligation to sustain those new interpretations while also affording the

agency's new rules only prospective effect and permitting the petitioner in the

case at hand to continue to receive the benefit of preexisting judicial precedent.

After all, decisions like *Chenery II*, *Stewart Capital*, and *Bowen* expressly

anticipate that there will be cases where administrative decisions should control

only conduct arising after they take legal effect.  *See Chenery II*, 332 U.S. at

203-04; *Stewart Capital*, 701 F.2d at 848-50; *cf. Bowen*, 488 U.S. at 213-15.

Neither is practice of this sort entirely foreign in other areas of the law:  not

infrequently courts will reach holdings that affect future litigants differently than

current ones.  Consider, for example, qualified immunity cases where courts

sometimes find that a constitutional violation has occurred, but that the violation

was not clearly established, in the process binding future litigants in a different

way than current ones.  *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223 (2009);

*Saucier v. Katz*, 533 U.S. 194 (2001).  *Chevron* step two and *Brand X* may mean

- 13 -

that agencies exercising delegated legislative power can effectively overrule judicial precedents.  But that does not necessarily mean their decisions must or should presumptively apply retroactively to conduct completed before they take legal effect.  If anything, and as we've seen in *De Niz Robles* and again today, the opposite presumption should apply.

The petition for review is granted and the case remanded to the BIA for further proceedings consistent with this opinion.

No. 14-9585, *Gutierrez-Brizuela v. Lynch*

**GORSUCH**, Circuit Judge, concurring.

There's an elephant in the room with us today.  We have studiously attempted to work our way around it and even left it unremarked.  But the fact is *Chevron* and *Brand X* permit executive bureaucracies to swallow huge amounts of core judicial and legislative power and concentrate federal power in a way that seems more than a little difficult to square with the Constitution of the framers' design.  Maybe the time has come to face the behemoth.

In enlightenment theory and hard won experience under a tyrannical king the founders found proof of the wisdom of a government of separated powers.  In the avowedly political legislature, the framers endowed the people's representatives with the authority to prescribe new rules of general applicability prospectively.  In the executive, they placed the task of ensuring the legislature's rules are faithfully executed in the hands of a single person also responsive to the people.  And in the judiciary, they charged individuals insulated from political pressures with the job of interpreting the law and applying it retroactively to resolve past disputes.  This allocation of different sorts of power to different sorts of decisionmakers was no accident.  To adapt the law to changing circumstances, the founders thought, the collective wisdom of the people's representatives is needed.  To faithfully execute the laws often demands the sort of vigor hard to find in management-by-committee.  And to resolve cases and controversies over

past events calls for neutral decisionmakers who will apply the law as it is, not as they wish it to be.

Even more importantly, the founders considered the separation of powers a vital guard against governmental encroachment on the people's liberties, including all those later enumerated in the Bill of Rights. What would happen, for example, if the political majorities who run the legislative and executive branches could decide cases and controversies over past facts? They might be tempted to bend existing laws, to reinterpret and apply them retroactively in novel ways and without advance notice. Effectively leaving parties who cannot alter their past conduct to the mercy of majoritarian politics and risking the possibility that unpopular groups might be singled out for this sort of mistreatment — and raising along the way, too, grave due process (fair notice) and equal protection problems. Conversely, what would happen if politically unresponsive and life-tenured judges were permitted to decide policy questions for the future or try to execute those policies? The very idea of self-government would soon be at risk of withering to the point of pointlessness. It was to avoid dangers like these, dangers the founders had studied and seen realized in their own time, that they pursued the separation of powers. A government of diffused powers, they knew, is a government less capable of invading the liberties of the people. *See* The

Federalist No. 47 (James Madison) ("No political truth is . . . stamped with the authority of more enlightened patrons of liberty" than the separation of powers).[1]

Founders meet *Brand X*. Precisely to avoid the possibility of allowing politicized decisionmakers to decide cases and controversies about the meaning of existing laws, the framers sought to ensure that judicial judgments "may not lawfully be revised, overturned or refused faith and credit by" the elected branches of government. *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); *see also Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410 n* (1792) ("[B]y the Constitution, neither the Secretary . . . nor any other Executive officer, nor even the Legislature, are authorized to sit as a court of errors on the judicial acts or opinions of this court."). Yet this deliberate design, this separation of functions aimed to ensure a neutral decisionmaker for the people's disputes, faces more than a little pressure from *Brand X*. Under *Brand X*'s terms, after all, courts are required to overrule their own declarations about the meaning of existing law in favor of interpretations dictated by executive agencies. *Nat'l Cable &*

---

[1] *See also, e.g.*, The Federalist No. 78 (Alexander Hamilton) ("[L]iberty can have nothing to fear from the Judiciary alone" but "ha[s] everything to fear from [the] union" of the judicial and legislative functions.); *Stern v. Marshall*, 564 U.S. 462, 483 (2011) (noting that "the framers considered it essential" to liberty to keep the executive and judiciary and the legislature and judiciary "truly distinct" (internal quotation marks omitted)); M. J. C. Vile, Constitutionalism and the Separation of Powers 168-69 (2d ed. 1998); Neil M. Gorsuch, *Of Lions and Bears, Judges and Legislators, and the Legacy of Justice Scalia*, 66 Case W. Res. L. Rev. 905, 912 (2016).

*Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-85 (2005). By *Brand X*'s own telling, this means a judicial declaration of the law's meaning in a case or controversy before it is not "authoritative," *id.* at 983, but is instead subject to revision by a politically accountable branch of government.

That's exactly what happened to Mr. Padilla-Caldera. First this court read the relevant immigration statutes to permit an alien who has entered the country illegally to seek a discretionary adjustment of status from the Attorney General. Then we remanded the case to allow the Attorney General to make that discretionary decision in Mr. Padilla-Caldera's case. *Padilla-Caldera v. Gonzales* (*Padilla-Caldera I*), 426 F.3d 1294 (10th Cir. 2005), *amended and superseded on reh'g by* 453 F.3d 1237 (10th Cir. 2006). But instead of undertaking that task, the BIA interpreted the statutory scheme to reach the opposite conclusion we had, applied its new statutory interpretation to Mr. Padilla-Caldera, and held him categorically forbidden from receiving a discretionary adjustment of status. *See Padilla-Caldera v. Holder* (*Padilla-Caldera II*), 637 F.3d 1140, 1143-44 (10th Cir. 2011). When the case returned to this court, we conceded that the relevant statutes were indeed ambiguous and acknowledged that *Brand X* required us to defer to the BIA's new interpretation, in the end holding that Mr. Padilla-Caldera was, as the agency said, categorically prohibited from applying for a discretionary adjustment of status. *Id.* at 1147-53. Quite literally then, after this court declared the statutes' meaning and issued a final decision, an executive agency was

-4-

permitted to (and did) tell us to reverse our decision like some sort of super court of appeals. If that doesn't qualify as an unconstitutional revision of a judicial declaration of the law by a political branch, I confess I begin to wonder whether we've forgotten what might.

Of course, since *Padilla-Caldera* we have reentered the field and sought to tame some of *Brand X*'s more exuberant consequences. So, for example, in *De Niz Robles* and now again today we have held that an agency's revision of a judicial decision of what the law is may bear only prospective effect, governing only future cases and controversies. As a result, an executive agency may no longer revise a judicial decision about the law's meaning with retroactive effect, like the BIA managed to do in the case of Mr. Padilla-Caldera. No doubt that addresses some of the due process and equal protection problems that follow from allowing politicized decisionmakers to decide cases and controversies about the meaning of existing law.

But even this doesn't fully resolve the problem. When the political branches disagree with a judicial interpretation of existing law, the Constitution prescribes the appropriate remedial process. It's called legislation. Admittedly, the legislative process can be an arduous one. But that's no bug in the constitutional design: it is the very point of the design. The framers sought to ensure that the people may rely on judicial precedent about the meaning of existing law until and unless that precedent is overruled or the purposefully

painful process of bicameralism and presentment can be cleared. Indeed, the principle of *stare decisis* was one "entrenched and revered by the framers" precisely because they knew its importance "as a weapon against . . . tyranny." Michael B.W. Sinclair, *Anastasoff Versus Hart: The Constitutionality and Wisdom of Denying Precedential Authority to Circuit Court Decisions*, 64 U. Pitt. L. Rev. 695, 707 (2003). Yet even as now semi-tamed (at least in this circuit), *Brand X* still risks trampling the constitutional design by affording executive agencies license to overrule a judicial declaration of the law's meaning prospectively, just as legislation might — and all without the inconvenience of having to engage the legislative processes the Constitution prescribes. A form of Lawmaking Made Easy, one that permits all too easy intrusions on the liberty of the people.[2]

Of course, *Brand X* asserts that its rule about judicial deference to executive revisions follows logically "from *Chevron* itself." 545 U.S. at 982. And that assessment seems fair enough as far as it goes. If you accept *Chevron*'s claim that legislative ambiguity represents a license to executive agencies to render authoritative judgments about what a statute means, *Brand X*'s rule

---

[2] *See* John F. Manning, *Lawmaking Made Easy*, 10 Green Bag 2d 191, 202 (2007); *see also Dep't of Transp. v. Ass'n of Am. R.Rs.*, 135 S. Ct. 1225, 1237 (Alito, J., concurring); *United States v. Nichols*, 784 F.3d 666, 670 (10th Cir. 2015) (Gorsuch, J., dissenting from the denial of rehearing en banc).

requiring courts to overturn their own contrary judgments does seem to follow pretty naturally.

But acknowledging this much only brings the colossus now fully into view. In the Administrative Procedure Act (APA), Congress vested the courts with the power to "interpret . . . statutory provisions" and overturn agency action inconsistent with those interpretations. 5 U.S.C. § 706. Congress assigned the courts much the same job in the immigration field where we happen to find ourselves today. 8 U.S.C. § 1252(a)(2)(D). And there's good reason to think that legislative assignments like these are often constitutionally compelled. After all, the question whether Congress has or hasn't vested a private legal right in an individual "is, in its nature, judicial, and must be tried by the judicial authority." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 167 (1803); *Stern*, 564 U.S. at 494-95.[3] Yet, rather than completing the task expressly assigned to us, rather than "interpret[ing] . . . statutory provisions," declaring what the law is, and overturning inconsistent agency action, *Chevron* step two tells us we must allow

---

[3] *See also Wellness Int'l. Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1965 (2015) (Thomas, J., dissenting); The Federalist No. 78 (Alexander Hamilton) ("The interpretation of the laws is the proper and peculiar province of the courts" and it "belong[s] to [judges] to ascertain . . . the meaning of any particular act proceeding from the [l]egislative body."); Robert H. Jackson, *Problems of Statutory Interpretation*, 8 F.R.D. 121, 123 (1948) ("Legislation is shaped by a majority . . . [b]ut when a ruling majority has put its commands in statutory form . . . the interpretation of their fair meaning and their application to individual cases should be made by judges as independent of politics as humanly possible . . . .").

an executive agency to resolve the meaning of any ambiguous statutory provision. In this way, *Chevron* seems no less than a judge-made doctrine for the abdication of the judicial duty. Of course, *some* role remains for judges even under *Chevron*. At *Chevron* step one, judges decide whether the statute is "ambiguous," and at step two they decide whether the agency's view is "reasonable." But where in all this does a court *interpret* the law and say what it *is*? When does a court independently decide what the statute means and whether it has or has not vested a legal right in a person? Where *Chevron* applies that job seems to have gone extinct.

Transferring the job of saying what the law is from the judiciary to the executive unsurprisingly invites the very sort of due process (fair notice) and equal protection concerns the framers knew would arise if the political branches intruded on judicial functions. Under *Chevron* the people aren't just charged with awareness of and the duty to conform their conduct to the fairest reading of the law that a detached magistrate can muster. Instead, they are charged with an awareness of *Chevron*; required to guess whether the statute will be declared "ambiguous" (courts often disagree on what qualifies); and required to guess (again) whether an agency's interpretation will be deemed "reasonable." Who can even attempt all that, at least without an army of perfumed lawyers and lobbyists? And, of course, that's not the end of it. Even if the people somehow manage to make it through this far unscathed, they must always remain alert to

-8-

the possibility that the agency will reverse its current view 180 degrees anytime based merely on the shift of political winds and *still* prevail. Neither, too, will agencies always deign to announce their views in advance; often enough they seek to impose their "reasonable" new interpretations only retroactively in administrative adjudications. Perhaps allowing agencies rather than courts to declare the law's meaning bears some advantages, but it also bears its costs. And the founders were wary of those costs, knowing that, when unchecked by independent courts exercising the job of declaring the law's meaning, executives throughout history had sought to exploit ambiguous laws as license for their own prerogative. *See, e.g.*, Philip Hamburger, Is Administrative Law Unlawful? 287-91 (2014) (recounting James I's effort to claim the right to interpret statutes, an effort rejected by the courts in a campaign Roscoe Pound called a "valiant fight" that confirmed the "supremacy of law").

Some claim to see a way out of our apparent predicament. They suggest that *Chevron* isn't so much about permitting agencies to assume the judicial function of *interpreting* the law as it is about permitting agencies to *make* the law, to effect their own preferences about optimal public policy when a statute is ambiguous. On this account, *Chevron*'s rule of deference isn't about trying to make judges out of agencies or letting them usurp the judicial function. Rather, it's about letting agencies fill legislative voids. When Congress passes ambiguous legislation, *Chevron* means we should read that as signaling a

legislative "intention" to "delegate" to the executive the job of making any reasonable "legislative" policy choices it thinks wise. And, to be sure, *Chevron* itself espouses just this view. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 862 (1984). In both *De Niz Robles* and again today we expressly acknowledge as much.

But however that may be, none of it rescues us from our riddle. For whatever the *agency* may be doing under *Chevron*, the problem remains that *courts* are not fulfilling their duty to interpret the law and declare invalid agency actions inconsistent with those interpretations in the cases and controversies that come before them. A duty expressly assigned to them by the APA and one often likely compelled by the Constitution itself. That's a problem for the judiciary. And it is a problem for the people whose liberties may now be impaired not by an independent decisionmaker seeking to declare the law's meaning as fairly as possible — the decisionmaker promised to them by law — but by an avowedly politicized administrative agent seeking to pursue whatever policy whim may rule the day. Those problems remain uncured by this line of reply.

Maybe as troubling, this line of reply invites a nest of questions even taken on its own terms. *Chevron* says that we should infer from any statutory ambiguity Congress's "intent" to "delegate" its "legislative authority" to the executive to make "reasonable" policy choices. *See id.* at 843-44. But where exactly has Congress expressed this intent? Trying to infer the intentions of an institution

-10-

composed of 535 members is a notoriously doubtful business under the best of circumstances.[4]  And these are not exactly the best of circumstances.  *Chevron* suggests we should infer an intent to delegate not because Congress has anywhere expressed any such wish, not because anyone anywhere in any legislative history even hinted at that possibility, but because the legislation in question is *silent* (ambiguous) on the subject.  Usually we're told that "an agency literally has no power to act . . . unless and until Congress confers power upon it."  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  Yet *Chevron* seems to stand this ancient and venerable principle nearly on its head.

Maybe worse still, *Chevron*'s inference about hidden congressional intentions seems belied by the intentions Congress has made textually manifest. After all and again, in the APA Congress expressly vested the courts with the responsibility to "interpret . . . statutory provisions" and overturn agency action inconsistent with those interpretations.  5 U.S.C. § 706.  Meanwhile not a word can be found here about delegating legislative authority to agencies.  On this record, how can anyone fairly say that Congress "intended" for courts to abdicate their statutory duty under § 706 and instead "intended" to delegate away its legislative power to executive agencies?  The fact is, *Chevron*'s claim about

---

[4]  *See, e.g.*, *Lexington Ins. Co. v. Precision Drilling Co.*, — F.3d —, No. 15-8036, 2016 WL 3999896, at *2 (10th Cir. July 26, 2016);  Kenneth A. Shepsle, *Congress Is a "They," Not an "It": Legislative Intent as Oxymoron*, 12 Int'l Rev. L. & Econ. 239, 244-45 (1992).

-11-

legislative intentions is no more than a fiction — and one that requires a pretty hefty suspension of disbelief at that.

Even supposing, too, that we could overlook this problem — even supposing we somehow had something resembling an authentic congressional delegation of legislative authority — you still might wonder: *can* Congress really delegate its legislative authority — its power to write new rules of general applicability — to executive agencies?  The Supreme Court has long recognized that under the Constitution "congress cannot delegate legislative power to the president" and that this "principle [is] universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution."  *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892).  Yet on this account of *Chevron* we're examining, its whole point and purpose seems to be exactly that — to delegate legislative power to the executive branch.

Not only is *Chevron*'s purpose seemingly at odds with the separation of legislative and executive functions, its effect appears to be as well.  While the line between legislative and executive functions may sometimes be murky, history does teach us a couple of things about that line.  First, we know that, consistent with the separation of powers, Congress may condition the application of a new rule of general applicability on factual findings to be made by the executive (so, for example, forfeiture of assets might be required if the executive finds a foreign country behaved in a specified manner).  *See Cargo of the Brig Aurora v. United*

-12-

*States*, 11 U.S. (7 Cranch) 382, 388 (1813). Second, we know Congress may allow the executive to resolve "details" (like, say, the design of an appropriate tax stamp). *See In re Kollock*, 165 U.S. 526, 533 (1897). Yet *Chevron* pretty clearly involves neither of these kinds of executive functions and, in this way and as a historical matter, appears instead to qualify as a violation of the separation of powers. *See Michigan v. EPA*, 135 S. Ct. 2699, 2713-14 (2015) (Thomas, J., concurring); *cf. City of Arlington v. FCC*, 133 S. Ct. 1863, 1877-79 (2013) (Roberts, C.J., dissenting); *Nichols*, 784 F.3d at 671-72 (Gorsuch, J., dissenting from the denial of rehearing en banc).

Of course, in relatively recent times the Court has relaxed its approach to claims of unlawful legislative delegation. It has suggested (at least in the civil arena) that Congress may allow the executive to make new rules of general applicability that look a great deal like legislation, so long as the controlling legislation contains an "intelligible principle" that "clearly delineates the general policy" the agency is to apply and "the boundaries of [its] delegated authority." *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989) (internal quotation marks omitted). This means Congress must at least "provide substantial guidance on setting . . . standards that affect the entire national economy." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 475 (2001); *cf. Touby v. United States*, 500 U.S. 160, 165-67 (1991) (suggesting a heightened standard might apply in the criminal setting). Some thoughtful judges and scholars have questioned whether standards

-13-

like these serve as much as a protection against the delegation of legislative authority as a license for it, undermining the separation between the legislative and executive powers that the founders thought essential.[5]

But even taking the forgiving intelligible principle test as a given, it's no small question whether *Chevron* can clear it. For if an agency can enact a new rule of general applicability affecting huge swaths of the national economy one day and reverse itself the next (and that is exactly what *Chevron* permits, *see* 467 U.S. at 857-59), you might be forgiven for asking: where's the "substantial guidance" in that? And if an agency can interpret the scope of its statutory jurisdiction one way one day and reverse itself the next (and that is exactly what *City of Arlington*'s application of *Chevron* says it can), you might well wonder: where are the promised "clearly delineated boundaries" of agency authority? The Supreme Court once unanimously declared that a statute affording the executive the power to write an industrial code of competition for the poultry industry violated the separation of powers. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537-42 (1935). And if that's the case, you might ask how is

---

[5] *See, e.g.*, *Ass'n of Am. R.Rs.*, 135 S. Ct. at 1246 (Thomas, J., concurring in the judgment); *Mistretta*, 488 U.S. at 415-16 (Scalia, J., dissenting); Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 329 (2002) (asserting that the Court has "found intelligible principles where less discerning readers find gibberish").

it that *Chevron* — a rule that invests agencies with pretty unfettered power to regulate a lot more than chicken — can evade the chopping block.[6]

Even under the most relaxed or functionalist view of our separated powers some concern has to arise, too, when so much power is concentrated in the hands of a single branch of government. *See* The Federalist No. 47 (James Madison) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny."). After all, *Chevron* invests the power to decide the meaning of the law, and to do so with legislative policy goals in mind, in the very entity charged with enforcing the law. Under its terms, an administrative agency may set and revise policy (legislative), override adverse judicial determinations (judicial), and exercise enforcement discretion (executive). Add to this the fact that today many administrative agencies "wield[] vast power" and are overseen by political appointees (but often receive little effective oversight from the chief executive to whom they nominally report), and you have a pretty potent mix. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010).[7] Under any conception of

---

[6] *See* Sanford N. Caust-Ellenbogen, *Blank Checks: Restoring the Balance of Powers in the Post-Chevron Era*, 32 B.C. L. Rev. 757, 774 (1991) (*Chevron* "upsets the balance created by the Supreme Court in its nondelegation doctrine. It is one thing for Congress to set policy at an abstract level and delegate specific implementation to the agency. It is quite another thing for Congress to delegate policy-setting to the agency.").

[7] *See also City of Arlington*, 133 S. Ct. at 1877-78 (Roberts, C.J., dissenting); Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245,

-15-

our separation of powers, I would have thought powerful and centralized authorities like today's administrative agencies would have warranted less deference from other branches, not more.  None of this is to suggest that *Chevron* is "the very definition of tyranny."  But on any account it certainly seems to have added prodigious new powers to an already titanic administrative state — and spawned along the way more than a few due process and equal protection problems of the sort documented in the court's opinion today and in *De Niz Robles*.  It's an arrangement, too, that seems pretty hard to square with the Constitution of the founders' design and, as Justice Frankfurter once observed, "[t]he accretion of dangerous power does not come in a day.  It does come, however slowly, from the generative force of unchecked disregard of the restrictions" imposed by the Constitution.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 594 (1952) (Frankfurter, J., concurring).

What I suspect about *Chevron*'s compatibility with the separation of powers finds confirmation in what I know.  The Supreme Court has expressly instructed us *not* to apply *Chevron* deference when an agency seeks to interpret a criminal statute.  Why?  Because, we are seemingly told, doing so would violate the Constitution by forcing the judiciary to abdicate the job of saying what the law is and preventing courts from exercising independent judgment in the interpretation

---

2250 (2001); Stephen Breyer, Making Our Democracy Work 109-10 (2010).

of statutes. *See, e.g.*, *Abramski v. United States*, 134 S. Ct. 2259, 2274 (2014) ("Whether the Government interprets a criminal statute too broadly . . . or too narrowly . . . a court has an obligation to correct its error."). An admirable colleague has noted that the same rationale would appear to preclude affording *Chevron* deference to agency interpretations of statutes that bear both civil and criminal applications. *See, e.g.*, *Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1027-32 (6th Cir. 2016) (Sutton, J., concurring in part and dissenting in part); *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 729-36 (6th Cir. 2013) (Sutton, J., concurring). A category that covers a great many (most?) federal statutes today. And try as I might, I have a hard time identifying a principled reason why the same rationale doesn't also apply to statutes with purely civil application. After all, the APA doesn't distinguish between purely civil and other kinds of statutes when describing the interpretive duties of courts. Neither did the founders reserve their concerns about political decisionmakers deciding the meaning of existing law to criminal cases; Article III doesn't say judges should say what the law is or decide whether legal rights have or haven't vested and been violated only when a crime is alleged. And certainly *Marbury* did not speak so meekly: it affirmed the judiciary's duty to say what the law is in a case that involved the interpretation of, yes, a civil statute affecting individual rights.

Some have suggested that criminal statutes should be treated differently when it comes to *Chevron* because they are not "administered" by an agency. *See*

-17-

*Gonzales v. Oregon*, 546 U.S. 243, 264-65 (2006).  I take this as a roundabout way of suggesting that Congress hasn't "delegated" its legislative authority in the criminal context like it has in the civil.  But as we've seen, the claim that Congress has delegated legislative authority even in the civil context is no more than a fiction.  And for that matter it's hard to see why the Justice Department doesn't "administer" criminal statutes in much the same way other agencies "administer" various civil statutes.  *See, e.g.*, *Crandon v. United States*, 494 U.S. 152, 177 (1990) (Scalia, J., concurring in the judgment) (acknowledging that "[t]he Justice Department . . . has a very specific responsibility to determine for itself what this statute means, in order to decide when to prosecute").  Of course, criminal law enforcement takes place in the courts, not before administrative agencies.  But often enough civil administrative actions also depend on court approval for their effectiveness, and as we've seen this may be a matter not merely of statutory but sometimes constitutional imperative.  *See* 5 U.S.C. § 706; Caust-Ellenbogen, *supra*, at 816; *see also supra* at 7.

Other arguments for rejecting *Chevron* deference (only) in criminal matters seem equally shaky.  Some suggest that principles of due process and equal protection demand that the criminal law be clear and clearly given by judges.  Others suggest that prosecutorial agencies have too many incentives to interpret criminal statutes expansively.  But while concerns about due process and fair notice surely reach their apex in the criminal context, I am uncertain why we

-18-

would view that as a license to neglect attending to them in the civil context. *See Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers."). Especially given the power our modern administrative state already enjoys, even without *Chevron*, to penalize persons in ways that can destroy their livelihoods and intrude on their liberty even when exercising only purely civil powers. *See Free Enter. Fund*, 561 U.S. at 499. And given that the line between "criminal" and "civil" statutes has often proven tricky enough to administer. *See, e.g.*, *Hudson v. United States*, 522 U.S. 93, 99-100 (1997) (suggesting the use of a balancing test composed of seven non-exclusive factors to tell the difference between civil and criminal statutory penalties). Neither, too, are prosecutorial agencies known to be alone in their capacity and willingness to interpret statutes aggressively. *See, e.g.*, *Michigan*, 135 S. Ct. at 2713 (Thomas, J., concurring) ("[W]e should be alarmed that [the agency] felt sufficiently emboldened by those precedents to make the bid for deference that it did here."); *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 69 (2011) (Scalia, J., concurring) (noting that the FCC "has repeatedly been rebuked in its attempts to expand the statute beyond its text, and has repeatedly sought new means to the same ends").

Beyond all that, *Chevron* has presented its fair share of practical problems in its administration. By way of illustration, consider just two examples. First,

-19-

we once thought *Chevron*'s presumption of delegation for ambiguous statutes applied uniformly to Congress's work. Then we learned it doesn't apply to criminal statutes. Now we know it doesn't always apply even when it comes to purely civil statutes. In *United States v. Mead Corp.*, 533 U.S. 218 (2001), the Court added a "step zero" to the *Chevron* sequence, one that requires courts to employ a multi-factor balancing test to decide whether to proceed to apply *Chevron* to a civil statute. *See id.* at 227-31. So today courts will only *sometimes* apply *Chevron* deference to ambiguous civil statutes. Neither, respectfully, does looking to the Supreme Court's case law supply a great deal of guidance on how to apply *Mead*'s balancing test. In recent years, the Court has declined to apply *Chevron* deference to arguably ambiguous civil statutes but it has only sometimes cited the *Mead* balancing test as the reason, leaving more than a few litigants and lower courts to wonder how they are supposed to proceed.[8]

    Second, long lingering questions linger still about just how rigorous *Chevron* step one is supposed to be. In deciding whether Congress has "directly spoken" to a question or left it "ambiguous," what materials are we to consult? The narrow language of the statute alone? Its structure and history? Canons of interpretation? Committee reports? Every scrap of legislative history we can dig

---

    [8] *See, e.g.*, *PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001); *see also* William N. Eskridge, Jr. & Lauren E. Baer, *The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretations from Chevron to Hamdan*, 96 Geo. L.J. 1083, 1097-1120 (2008).

up?  Some claim to have identified at least three potential variants of *Chevron*

jurisprudence governing the line between step one and step two in the Supreme

Court's case law.[9]

Of course, we often retain even mistaken judicial decisions because

reliance interests have arisen around them.  But *Chevron* is a procedural rule, and

procedural rules generally receive little precedential consideration when

experience proves them problematic in their administration.  *Payne v. Tennessee*,

501 U.S. 808, 828 (1991).  No doubt this is because parties form reliance interests

primarily around substantive rules of law that allocate property and define the

limits of permitted behavior, while procedural rules merely govern how courts

will go about their own business when deciding disputes many years later that

parties often cannot foresee when arranging their affairs.  And it is particularly

hard to see how *Chevron* might have engendered serious reliance interests by

individuals (if not agencies).  Not only because of the uncertainties associated

with its administration.  But because even when clearly and properly

implemented, *Chevron*'s very point is to permit agencies to upset the settled

---

[9]  *See, e.g.*, Jack M. Beerman, *End the Failed Chevron Experiment Now:
How Chevron Has Failed and Why It Can and Should Be Overruled*, 42 Conn. L.
Rev. 779, 817-22 (2010); *see also Chevron*, 467 U.S. at 842 (resolving a case
under step one only if "Congress has directly spoken to the precise question at
issue"); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987) ("[e]mploying
traditional tools of statutory construction"); *Dole v. United Steelworkers of Am.*,
494 U.S. 26, 35 (1990) (same); *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
512 U.S. 218, 225-27 (1994) (relying on plain meaning only).

expectations of the people by changing policy direction depending on the agency's mood at the moment. So if reliance interests count, they would seem to count against retaining *Chevron*.

All of which raises this question: what would happen in a world without *Chevron*? If this goliath of modern administrative law were to fall? Surely Congress could and would continue to pass statutes for executive agencies to enforce. And just as surely agencies could and would continue to offer guidance on how they intend to enforce those statutes. The only difference would be that courts would then fulfill their duty to exercise their independent judgment about what the law *is*. Of course, courts could and would consult agency views and apply the agency's interpretation when it accords with the best reading of a statute. But *de novo* judicial review of the law's meaning would limit the ability of an agency to alter and amend existing law. It would avoid the due process and equal protection problems of the kind documented in our decisions. It would promote reliance interests by allowing citizens to organize their affairs with some assurance that the rug will not be pulled from under them tomorrow, the next day, or after the next election. And an agency's recourse for a judicial declaration of the law's meaning that it dislikes would be precisely the recourse the Constitution prescribes — an appeal to higher judicial authority or a new law enacted consistent with bicameralism and presentment. We managed to live with the administrative state before *Chevron*. We could do it again. Put simply, it seems

-22-

to me that in a world without *Chevron* very little would change — except perhaps the most important things.